# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**JANE DOE,**                                          *
    c/o
    Charles G. Douglas, III, Esq.        *
    14 South Street #5
    Concord, New Hampshire 03301         *

    *Plaintiff*,                         *

                                  Case No. _____

    v.                                   *

**ST. PAUL'S SCHOOL,**                                *
    325 Pleasant Street
    Concord, New Hampshire 03301         *        **JURY TRIAL DEMANDED**

    *Defendant*.                         *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jane Doe ("Plaintiff," "Ms. Doe," or "J.D."),[1] by and through her undersigned counsel, hereby sues Defendant St. Paul's School ("Defendant" or "SPS") under Title IX of the 1972 Amendments to the Higher Education Act and, as set forth below, and other causes of action permitted under New Hampshire law to remedy the sexual assaults and harassment Ms. Doe suffered as a direct result of SPS' utter breach of its duty to protect children under its care and to provide an education free from sexual harassment and other forms of gender-based harassment.

## PARTIES, JURISDICTION, AND VENUE

---

[1] With this Complaint, Plaintiff has contemporaneously filed a motion to proceed under a pseudonym that sets forth the legal and factual authority for protecting the identity of J.D., who was sexually victimized as a minor due to Defendant's negligence.

1.      Plaintiff Jane Doe is a natural person who is, and was for all relevant times, a resident of the State of Maryland.

2.      Defendant St. Paul's School is a non-profit corporation organized and existing under the laws of New Hampshire that maintains its principal place of business at 325 Pleasant Street, Concord, New Hampshire 03301. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claim asserts a federal question over which this Court has jurisdiction and Plaintiff asserts state-law claims over which this Court has supplemental jurisdiction.

3.      This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant is domiciled in and conducts business within this judicial district.

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

5.      This claim is timely pursuant to RSA 508:8 because it is brought within two years of Ms. Doe's 18th birthday.

## FACTS COMMON TO ALL COUNTS

6.      J.D. enrolled at SPS in September 2012, when she was just 13 years old.

7.      SPS is an elite Episcopal boarding school set amid 2,000 acres of woodland and meadow in Concord, New Hampshire. The school was founded in 1856 and its graduates include notables in business, politics, academia, and the arts.

8.      According to SPS' website, the estimated annual cost of attendance for SPS is $57,985.

9.      Prior to SPS, Ms. Doe attended a small, private middle school where she excelled in academics, art, and was captain of the girls' soccer team.

10.     Ms. Doe grew up in a closely-knit family and had strong relationships with her parents and older brother.

11.     Ms. Doe is biracial. Her mother is from India and her father is European. Ms. Doe's parents work in the non-profit and governmental sectors and therefore earn far less than the average parent of a student at SPS.

12.     SPS heavily recruited Ms. Doe, starting in her 8th grade year.

13.     Although Ms. Doe had a variety of options for high school, she was in awe of SPS. Based on her parents' income, Ms. Doe received financial aid from SPS that covered nearly all of her tuition and board. Ms. Doe turned down a full scholarship from Miss Porter's School to attend SPS.

14.     The SPS recruiter told Ms. Doe and her parents that the school offered a caring, closely-knit community in which she would have "180 parents" looking out for her safety and well-being. Ms. Doe's middle school was exactly that type of community and Ms. Doe and her parents believed she would thrive at SPS as she had in middle school.

### SPS' HYPERSEXUALIZED CULTURE

15.     Ms. Doe found SPS to be far from the "safe, caring community" she was promised.

16.     From the time she arrived on campus, Ms. Doe experienced unwelcome sexual advances from some male students who were emboldened by formal and informal "traditions" at the school.

17.     Unbeknownst to Ms. Doe, older boys started to sexually target her the moment she set foot on campus.

18.     Prior to the beginning of the school year, SPS provided its students with a school directory for the upcoming year. The directory contains photographs of the students, including incoming freshmen. Male students at SPS created a tradition of getting together in groups to rate the incoming underage girls in their directories to determine "targets" for "scoring."

19.     These rankings take on special significance in the games of sexual conquest in which male students openly competed with one another to "score" or "slay"—meaning to have sexual relations with (generally younger) female students—in a given period.

20.     As part of these games, male students ranked the female students according to attractiveness and actively pursued the young women in the top ranks.

21.     The concept of "scoring"—that is, boy's tracking their sexual conquests of girls—has long been part of SPS' ethos.

22.     In or about 2012, an SPS student created a website "scoreboard" to track male SPS students' sexual conquests. Upon information and belief, the student rumored to host the website was subjected to no discipline, and SPS did not investigate or eliminate the widespread practice of older students "scoring" with freshman girls. A physical scoreboard was also placed in a laundry room of the building on campus known as the "Upper."

23.     This practice was the basis for the "Senior Salute"—a school tradition, dating back at least three years, in which senior, male SPS students tried in the spring before their commencement to "score" with as many underclass, female SPS students as possible.

24.     The importance of "scoring" was extensively discussed in "The Real Student Handbook: The Little Red Book," an independent study project prepared by an SPS student and for which SPS' Rector, Michael G. Hirschfeld (himself an SPS alumnus and parent), served as faculty advisor.

25.     This culture of "scoring" was also openly discussed in various pieces published in SPS' student newspaper, *The Pelican*. In one such piece, an SPS student wrote that sexual conquest is a "right of initiation" and an "accepted and expected" part of life at SPS.

26.     Owen Labrie, a recognized SPS student "leader," wrote about the culture of "scoring" in a 2013 essay in *The Pelican,* inquiring, "Is secret scoring in dirty Schoolhouse closets the key to happiness?"

27.     In or around 2013, a male SPS student propositioned Liesbeth Hirschfeld—Rector Michael Hirschfeld's *wife*—to engage in the Senior Salute, erasing any doubt that top administrators at SPS were aware of this nefarious tradition. One former, longtime SPS faculty member has been quoted as stating, "I don't understand the culture of some of the adults there[.] . . . Somebody should have said, 'Senior [S]alute? Not in our school.'" Todd S. Purdum, *Dangerous Privilege*, Vanity Fair, Mar. 2016, at 207.

28.     Nevertheless, and as recounted in recent media reports, the Senior Salute tradition of sexual conquest continued through the end of the 2013-2014 school year and neither SPS institutionally nor any individual administrator at SPS put a stop to it.

29.     Male students were so free to pursue "scoring" and "slaying" that they brought a sofa into an equipment storage shed for that express purpose. Students referred to the shed as the "Mars Hotel" (pictured below), and students reported that the shed floor was "lined with discarded condoms."



30.    Some male students also had access to keys to secluded parts of SPS' campus, which they "passed down" to other males for the purposes of "scoring" and "slaying."

31.    Ms. Doe felt harassed from the time she arrived on SPS' campus.

32.    At one of the first SPS events she attended, the Living in Community ("LinC") and Challenge Day event, Ms. Doe felt "paraded" in front of older boys who openly ogled freshman girls and referred to them as "fresh meat."

33.    Ms. Doe was also sexually harassed every time she walked into the dining hall. Boys did this by sitting on couches in the common area that opens into the dining hall. Boys ogled, catcalled, and made sexual comments about girls, including Ms. Doe, as the girls entered and left the dining hall.

34.    Ms. Doe also experienced sexual harassment at school dances. Male students grabbed and groped her, thrusted their bodies against her, and placed their hands down her pants while administrators stood by and did nothing.

35.    The hypersexualized culture at SPS was fueled in large part by drugs and alcohol. Ms. Doe was shocked to observe the prevalent use of cocaine, heroin, mushrooms, marijuana,

prescription opioids, stimulants (viz., Adderall), tranquilizers, and other illicit drugs by students as young as 13.

36.     Based upon SPS' strong connection to the Concord Police Department ("Concord Police")—its head of security is a retired Lieutenant from the Concord Police—SPS students felt no fear of criminal prosecution for taking such drugs.

### SPS' TOXIC SEXUAL ENVIRONMENT STEMS FROM HIRSCHFELD'S "FREEDOM WITH RESPONSIBILITY" MANAGEMENT STYLE

37.     Hirschfeld and other top SPS officials received but failed to act upon *specific warnings* of boys targeting girls in the dorms.

38.     For example, email communications from SPS employees during the 2013-2014 school year detailed numerous instances of boys "seeking out" underage girls in an "inappropriate manner" in or near the girls' dorms.

39.     Although he indicated that he would address the issue at a meeting of the heads of house, Hirschfeld also indicated that he was "looking forward to graduation," suggesting that his true hope was that the problem, for that year anyway, would simply go away on its own when school closed for the summer.

40.     Hirschfeld's failure to take this threat seriously is particularly disturbing in light of the New England Association of Schools and Colleges' Commission on Independent Schools' (the "Committee") 2007 finding that SPS should "review policies regarding the supervision of students during the evening hours."

41.     The Committee also noted that SPS should "examine whether or not students are using their free evening hours productively and getting to bed at a reasonable hour . . . " and "re-examine the balance between student freedom and institutional responsibility to ensure that supervision and safety are not compromised by idealism."

42.     SPS failed to heed any of those recommendations.

## SPS' FAILURE TO STOP RITUALIZED STATUTORY RAPE
## AND SEXUAL HARASSMENT

43.     SPS failed to investigate, report, or take any meaningful action to stop the statutory rape of a senior administrator's son.

44.     The administrator's son at the age of 13 started a sexual relationship with an 18-year-old senior student at SPS.

45.     This relationship was reported to Rector Hirschfeld.

46.     Hirschfeld failed to report the abuse to state or local authorities, failed to engage in any investigation, and failed to take any meaningful action to prevent future statutory rape.

47.     Instead, he changed the room assignment of the 18-year-old student and, upon information and belief, did not further discipline the senior for engaging in unlawful conduct.

48.     This failure is not surprising given SPS' pattern of ignoring sexual assault and harassment. SPS was, or should have been, aware that Labrie and other senior men had escalated the Senior Salute tradition by joining the "Slaymakers," a team of competitors in the Senior Salute founded by 2013 SPS alumnus Malcolm Salovaara.

49.     The competitive goal for the Slaymakers was to "score" points by engaging in sexual contact, including intercourse, with as many freshman girls as possible in the weeks leading up to commencement. The young men who participated in this competition openly bragged about their intent to "bone," "score," or "slay" as many underage girls as possible.

50.     SPS was, or should have been, aware that Salovaara possessed keys to secluded and secured SPS facilities that the Slaymakers and others used as "hook-up" spots for "scoring." As the Slaymakers' founding member, Salovaara "passed down" to Labrie keys to locked and

secluded SPS buildings, including the keys to a locked, secluded, rooftop room in the building where at least one known assault took place.

51.     The Slaymakers also created and passed down a *papier-mâché* "slaying mask" as well as templates to be used for Senior Salute invitations.

52.     The Slaymakers openly communicated their plans to "break the slaying records in the spring [of 2014]" and the group separately referenced the period of their abhorrent behavior as "Slaypril."

53.     Labrie and his fellow Slaymakers openly and in the presence of SPS faculty and staff engaged in the ritual of "rubbing" the dining hall engraving of the group's namesake, Robert Barrie Slaymaker, pictured below:



54.     Salovaara celebrated the Slaymakers in the following post to Labrie's public Facebook page:



**Malcolm Salovaara** ▶ **Owen Labrie**
October 11, 2013

The sluttiest of all sluts; the most insatiable of all nuts. The quincentenary phenom, sent with the same frequency and purpose as the plague: to slay sans remorse or sentiment, to leave a smothering sendero of destruction in its wake. On the occasion of your birthday, take a moment to reflect on the wisdom of the Marquis de Sade:
Lust's passion will be served; it demands, it militates, it tyrannizes.
Also, here is a photo of you sucking the proverbial, and my literal teet. — with **Owen Labrie**.

55.    Indeed, the Slaymakers' participation in Senior Salute was so central to Labrie's identity at the school that his yearbook message indicated simply "Slaymaker '47: Nuff said" (presumably, a solecistic twist on AK-47).

56.    As commencement approached, Labrie and Marchese drafted a "target list" that was communicated on SPS' internal computer networks and included the names of ***seventeen*** (17) female SPS students with whom the men wished to "score." At least ***seven*** (7) of these female students were under the age of 16 and therefore unable to give legal consent in New Hampshire.

57.    One of the listed underage female student targets was Chessy Prout, Ms. Doe's classmate who was sexually assaulted by Labrie in May 2014.

58.    The target list formed the basis of a bet between Marchese and Labrie as to which one could "score" the most girls on the list.

59.    Rumors regarding the bet were widely circulated throughout campus in the months leading up to commencement in May 2014.

60.     According to documents subsequently filed by the Merrimack County Attorney's office in a criminal case against him, Labrie described his style of "slaying" as to "*feign intimacy… then stab them in the back…THROW ['EM IN THE DUMPSTER…  I lie in bed with them… and pretend like I'm in love*."

61.     In those same documents, Labrie is reported to have stated, regarding a young woman who refused his invitation, "*she turned me down…fucking hate forbidden fruit…fuckin['] girls so much… another dumb cum-bucket struck from my nut sucking, suck it slut, slut fucking bucket list…*"

62.     The same documents also indicate that Labrie and his counterparts showed a complete disregard for the legal age of consent, communicating, "junior boarding school… 15…and a half… You could be thrown in jail bro… pretty sure the bitch was 12… and the fuckin' bum is great…hahaha… HER PREPUBESCENT BUM… LOVE IT… MCCARTHY AND I ARE GONNA BE BAILIN['] YOU OUT OF JAIL…"

63.     For his part, Rector Hirschfeld admits having heard the terms "slay" and "slayer" as used by male and female students prior to the assault. However, in a speech to students in the spring of 2015, Hirschfeld stated, "***While these words made me uneasy, I did nothing as the head of the school to address their use nor, to my knowledge, did anyone else***."

64.     SPS similarly turned a blind eye to Owen Labrie's reputation as a sexual predator. For example, in spring 2014, a female student informed a senior administrator that Labrie had been "overly aggressive" in a sexual experience, reporting that he had bitten her and pulled her hair, among other things.

65.     SPS took *no* significant action to investigate this allegation nor any other instances of alleged aggressive sexual behavior by Labrie.

66.     Had SPS conducted the careful investigation that was plainly warranted and taken appropriate action, Labrie's competition with Marchese—and the actions of the Slaymakers in general—could have been easily prevented. SPS' failure to act resulted in, among other harms, Labrie's sexual assault of Chessy Prout in May 2014.

**MS. DOE IS REPEATEDLY SEXUALLY ASSAULTED ON SPS' CAMPUS**

67.     In the early fall and winter of 2012, J.D. began a relationship with a classmate, M.L.

68.     While Ms. Doe consented to a romantic relationship with M.L., she did not consent to sexual contact with him.

69.     Beginning in December 2012 and continuing into the spring semester of 2013, M.L. engaged in a series of non-consensual sexual acts with Ms. Doe.

70.     The first sexual assault occurred on or around December 8, 2012, just after an SPS dance. M.L. offered to walk Ms. Doe back to her dorm. During the walk, M.L. grabbed Ms. Doe and attempted to digitally penetrate her. Ms. Doe was menstruating and was wearing a tampon and thus cried out in pain at M.L.'s sudden assault on her. Feeling distraught, Ms. Doe ran back to her dorm and told her roommate and other girls in her dorm what had happened.

71.     The next day, M.L. encountered Ms. Doe while she was in the SPS student center. Ms. Doe confronted M.L. about the incident and M.L. responded that she "needed to make it up to him." M.L. attempted to place Ms. Doe's hand on his penis. After she pulled away, M.L. held her down and attempted to force his penis into her mouth. Ms. Doe panicked and ran away.

72.     The following day, Ms. Doe encountered M.L. on a path near the hockey center. M.L. insisted that Ms. Doe was giving him "blue balls" and he forced her to the cold, muddy ground and forced his penis into her mouth. Ms. Doe was crying and was having difficulty

breathing because she was fighting a cold and suffering from congestion and a sore throat. In addition to crying, Ms. Doe was gagging and regurgitating. M.L. nonetheless forced her to perform oral sex on him until he climaxed. Ms. Doe ran to her dorm visibly upset, with mascara smeared by her tears and mud- and grass-stained pants. Ms. Doe's advisor did not inquire as to why she was in such a state. Ms. Doe went straight to her room and told her roommate what had happened.

73.     M.L.'s abuse of Ms. Doe continued and escalated in the weeks following the initial assault. M.L. had non-consensual sexual contact with Ms. Doe on at least four more occasions. Each time, M.L. forced J.D. to perform oral sex on him. In one instance, M.L. locked Ms. Doe in a bathroom in the Hargate building and choked her in the course of a forced sexual encounter.

74.     Shortly after the sexual assaults, Ms. Doe's health and academic performance began to noticeably suffer.

75.     Among other things, Ms. Doe began to go to the health center to request to be placed in "sleep deprivation"—such that she would be permitted to rest without academic consequences. Ms. Doe also requested medications for her throat because she suffered from numerous infections after the sexual harassment and abuse by M.L.

76.     Ms. Doe disclosed her sexual assaults and harassment to SPS Assistant Dean of Students Michelle M. Taffe in the winter months of 2012. Ms. Taffe failed to report the sexual assault to state or local authorities, failed to alert Ms. Doe's parents, failed to conduct any investigation, failed to do anything to stop the ongoing sexual assaults and harassment, and failed to offer Ms. Doe *any* accommodations based on the sexual harassment and assaults she had reported.

77.     At some point during the 2013-2014 school year, Ms. Doe's friends, who were concerned about her, informed an advisor who then informed SPS Dean of Students Chad Green both orally and, upon information and belief, in an email that J.D. had been sexually abused.

78.     Ms. Doe's friends also (falsely) reported to Dean Green that Ms. Doe had sexual relations with an 18-year-old SPS student when she was 13 years old.

79.     Despite this report, administrators at SPS failed to make any report to state or local authorities, failed to conduct any investigation, failed to even inform Ms. Doe's parents, and failed to offer Ms. Doe *any* accommodations for the sexual assaults and harassment that she had experienced on SPS' campus.

## SPS TREATS J.D. LIKE A CRIMINAL, NOT A VICTIM

80.     Shortly after administrators at SPS became aware J.D. had been raped, they accused her of stealing a bag belonging to another student.

81.     Even though J.D. was exonerated from the bag stealing incident, she was ordered to undergo "counseling"—not for her rapes and assaults but her "involvement in theft" against wealthy fellow students—with Theresa Ferns, Ph.D., who is now Vice Rector for School Life at SPS. Although Dr. Ferns purported to be a confidential counselor, Ms. Doe quickly learned that everything she told Dr. Ferns was communicated to SPS Assistant Dean of Students Chad Green and others in SPS' administration.

82.     In one of her initial "counseling sessions," Dr. Ferns confronted Ms. Doe about "making up a story about being raped" by another student whom Ferns believed was over the age of 18. Aside from baselessly accusing Ms. Doe of fabricating the event, Dr. Ferns did not investigate the allegations, failed to report the allegations to authorities or to Ms. Doe's parents,

and failed to offer Ms. Doe *any* accommodations for the rapes and harassment that she experienced on SPS' campus.

83.    Dr. Ferns worked closely with Mr. Green to "keep an eye" on J.D., publicly labeling her, the scholarship student who was relatively less privileged, as having a problem of "stealing" her wealthy classmate's clothing despite the utter lack of any factual basis for that assertion.

84.    Ms. Doe's health and academic performance continued to suffer throughout the spring semester of her freshman year.

85.    For instance, in February 2013, Ms. Doe's advisor sent an email to Ms. Doe's mother indicating that she was "worried" about J.D. and that J.D. was "under a lot of stress and tries so hard to keep a strong exterior but [she] can see [J.D.] is upset."

86.    Even though administrators were fully aware of the allegations of sexual assault and statutory rape against Ms. Doe, administrators at SPS reduced Ms. Doe's allegations to her being difficult and then apparently used their (unproven) record of Ms. Doe's "theft" and "dishonesty" to justify their decision to not investigate her allegations.

87.    Although administrators at SPS constantly communicated their concerns about Ms. Doe's "stealing" to her parents, they made *no* mention of the assaults against Ms. Doe.

88.    For example, Ms. Doe was accused of "stealing" a generic SPS gym shirt in April 2013. Even though the "theft" was never proven, Ms. Doe's counselor told her parents "I haven't told her this, but she will be in serious trouble if she is caught lying about anything."

89.    Recognizing Ms. Doe's declining health and her extreme anxiety about participating in any SPS activities due to the hypersexualized environment and the administration's targeting of her, Dr. Ferns forced J.D. to take an "early leave" in May 2013.

Referring to the prior reports of sexual assault and harassment, Dr. Ferns also told Ms. Doe to "stop spreading lies," and she cautioned her that alleging sexual assault by a person Dr. Ferns believed to be 18 would "ruin his life."

90.     In addition, administrators at SPS took the punitive action of placing Ms. Doe in a lower-level math class. Ms. Doe had trouble focusing on math because her rapist was in the same class. Rather than investigating the sexual assaults and harassment and/or removing the rapist, SPS deprived Ms. Doe of a valuable educational opportunity.

91.     In the fall of 2013, Ms. Doe continued to struggle to attend classes and stopped participating in school activities and regularly sought treatment in the health center.

92.     Overwhelmed by trauma and SPS' failure to do anything about it, Ms. Doe began to engage in increasingly risky behavior.

93.     Among other things, Ms. Doe had sex with an 18-year-old senior student at SPS when she was only 14 years old. This is a statutory rape under New Hampshire law.

94.     In November 2013, Mr. Green again accused Ms. Doe of the authorized "borrowing" of another student's clothing. Despite admitting "there is not enough information for me to take further action," Mr. Green warned Ms. Doe's parents that "we don't have any further episodes which, however indirectly, seem to point toward her potential involvement in theft."

95.     Beginning in January 2014, administrators at SPS communicated concerns about Ms. Doe's health and level of participation in school, indicating she was "out of sorts" as she was missing classes and she may have been vomiting on a regular basis.

96.     Nonetheless, Mr. Green continued his quest to prove that Ms. Doe was a liar and a thief instead of investigating her expressed allegations of sexual assaults and sexual harassment.

16

97.     On the evening of the winter formal in February 2014, Ms. Doe consumed alcohol with a group of three other SPS students prior to the dance. The alcohol was provided by a female student in Ms. Doe's dorm.

98.     Unbeknownst to Ms. Doe, the girl who gave her the alcohol called Mr. Green moments after giving the alcohol to Ms. Doe and falsely told Mr. Green that Ms. Doe had stolen the girl's dress. The girl's aim was to ensure Ms. Doe would get into trouble when Mr. Green confronted her at the dance. This action was motivated, at least in part, by the girl's feeling that Ms. Doe was a "troublemaker" and that she was "spreading lies" about boys assaulting her.

99.     As soon as Ms. Doe arrived at the dance, Mr. Green found her, grabbed her, and accused her of wearing another student's dress.

100.    In fear for her safety, Ms. Doe fled and voluntarily reported to SPS' health center where she admitted that she had been drinking alcohol with three other girls.

101.    Mr. Green responded to the health center and ordered that J.D. be detained there for several days—with no access to a phone or other device that would have allowed J.D. to communicate with her parents.

102.    Ms. Doe told Mr. Green from whom she had obtained the alcohol and informed him that she had text messages confirming the same.

103.    While Ms. Doe was detained in the health center, the student who provided the alcohol stole Ms. Doe's phone and threw it in a snow bank.

104.    Although the student who provided the alcohol admitted to stealing and destroying Ms. Doe's phone, she was not disciplined by administrators at SPS.

105.    Instead, Mr. Green and Rector Mike Hirschfeld forced Ms. Doe to withdraw from the school in the middle of the semester or be expelled. Hirschfeld claimed that Ms. Doe must be

removed from the school based on her (unsubstantiated) "pattern of theft," her drinking, and the fact that she ran away from Mr. Green. None of the other four girls, including the girl who admitted stealing Ms. Doe's phone, were forced to leave the school.

## SPS DESTROYED J.D.

106.    Based on SPS' conduct, J.D. was forced to enroll in a public, inner-city high school at the end of the school year and just prior to final exams—forcing J.D. to try to adjust to a new environment and learn a year's worth of material in a matter of weeks.

107.    Due to the severity of her emotional distress stemming from her encounters of sexual assault at SPS, the sexually hostile environment at SPS, and the treatment she received from administrators at SPS, J.D. was forced to undergo extensive psychiatric treatment.

108.    Thereafter, J.D. finished her high school education on a "home and hospital" program.

109.    Despite her previously stellar academic career, J.D. has not been able to enroll in college as a full-time student and has been left emotionally scarred. She has been and will likely continue to function far below the expectation of someone with her talent and intelligence.

## CAUSES OF ACTION

### COUNT ONE
*Violation of 20 U.S.C. § 1681, et. seq.*
*Title IX of the Education Amendments Act*

110.    Plaintiff incorporates by reference and adopts the allegation of facts contained in the previous paragraphs as if fully set forth herein.

111.    During the relevant timeframe, Defendant was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).

112.    Defendant exercised substantial control over both students who assaulted Ms. Doe and over the boys who harassed her. All the events giving rise to this claim occurred on SPS' grounds.

113.    In or about October 2013, Ms. Doe faced severe discrimination based on sex when she was sexually assaulted orally and digitally on school grounds by M.L. Ms. Doe was also the victim of statutory rape and of a pattern of unrelenting sexual harassment. The sexual assaults and harassment J.D. endured were sufficiently severe, pervasive, and objectively offensive to constitute a hostile educational environment for her at SPS.

114.    Defendant was on actual notice of *both* the sexual assaults committed on Ms. Doe *and* the hypersexual hostile environment that existed at the school during Ms. Doe's time there.

115.    Despite being on actual notice of the assaults on and harassment of Ms. Doe, the school failed to take meaningful action to investigate the assault and/or to protect Ms. Doe from retaliation on the part of faculty, staff, and fellow students regarding Ms. Doe's attempts to seek out a safe educational environment.

116.    Defendant acted with deliberate indifference to the complaints and other notice regarding the ongoing hostile education environment, ongoing threats, bullying, and retaliation faced by Ms. Doe after reporting that she was sexually assaulted.

117.    The hostile educational environment at SPS effectively barred Ms. Doe's access to educational opportunities and benefits because she was forced to leave SPS due to the continuing hostile environment at the school and due to ongoing bullying and retaliation at the school.

118.    In addition to the foregoing violations of Title IX, SPS violated its Title IX obligations by:

    a.    Failing to have a Title IX coordinator or any other person to receive complaints about gender-based discrimination, harassments, and/or assaults;

    b.    Failing to have any policy for a student's reporting of sexual harassment and/or sexual assault;

    c.    Failing to have a program for prevention of sexual harassment and sexual assault;

    d.    Failing to have a program or policy for investigating sexual harassment or sexual assault;

    e.    Failing to have a program or policy for offering accommodations to victims of sexual assault;

    f.    Failing to have a program or policy for preventing retaliation against those who report sexual harassment and/or sexual assault; and,

    g.    Retaliating against Ms. Doe for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

119.    As a direct and proximate cause of Defendant's violation of Title IX, Ms. Doe has been deprived of educational opportunities and benefits that delayed her academic attainment during her high school education and thereafter. This deprivation was the result of Defendant's deliberate indifference to the hostile educational environment at SPS.  As a direct and proximate cause of Defendant's violation of Title IX, Ms. Doe has experienced and will likely continue to experience severe emotional distress accompanied by objective physical manifestations and/or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), loss of functioning, loss of earning potential, medical bills, and other pecuniary harms to be established at trial.

**WHEREFORE** Plaintiff demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; and, all other and further relief that justice may require.

## COUNT TWO
### *Breach of Fiduciary Duty*

120.    Plaintiff adopts and incorporates by reference the previous paragraphs as if they are fully set forth herein.

121.    J.D. enrolled in SPS as a residential boarding student in the fall of 2012, when she was 13 years old.

122.    Defendant had a fiduciary relationship with Ms. Doe, a residential student and minor.

123.    As a New Hampshire educational institution, SPS owed Ms. Doe a special duty of trust and confidence to ensure her safety and well-being.

124.    Defendant, through Rector Hirschfeld and SPS' Board of Trustees, administrators, faculty, or staff, breached their duty owed to Ms. Doe by, among other things:

      a.    Failing to properly protect Ms. Doe, a minor, from sexual abuse and harassment;

      b.    Improperly protecting Ms. Doe, a minor, from sexual abuse and harassment;

      c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

      d.    Failing to investigate, correct, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife and made public by Chessy Prout;

      e.    Failing to investigate, prevent, and/or otherwise address references to "scoring" made in student publications;

      f.    Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

      g.    Ignoring and/or otherwise failing to properly address complaints about numerous instances of boys "seeking" girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

      h.    Failing to promptly report Ms. Doe's sexual assaults to the authorities;

      i.    Failing to take any action to prevent retaliation against Ms. Doe after her assaults were reported to SPS;

      j.    Failing to conduct an exit interview with Ms. Doe when she left the school;

k.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies; and,

l.   Retaliating against Ms. Doe for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

125.   Defendant, through its Board of Trustees, administrators, faculty, or staff, knew or should have known that it had created an opportunity for Ms. Doe to be sexually assaulted and harassed.

126.   Defendant's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

127.   As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, Ms. Doe has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

128.   As a direct and proximate result of Defendant's negligence, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of the jurisdictional amount of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as lost wages, interest, costs, and other relief as justice requires.

## COUNT THREE
### *Negligence*

129.    Plaintiff adopts and incorporates by reference the previous paragraphs as if they are fully set forth herein.

130.    In the fall 2012, J.D. enrolled at SPS and was thereby deprived of the protection of her parents.

131.    Upon Ms. Doe's enrollment, Defendant assumed custody of her and other students housed on the school's premises.

132.    In so doing, Defendant entered into a relationship with Ms. Doe that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect Ms. Doe from reasonably foreseeable harm.

133.    Defendant, through Rector Hirschfeld and SPS' Board of Trustees, administrators, faculty, or staff, breached its duty owed Ms. Doe by, among other things:

   a.   Failing to properly protect Ms. Doe, a minor, from sexual abuse and harassment;
   b.   Improperly protecting Ms. Doe, a minor, from sexual abuse and harassment;
   c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;
   d.   Failing to investigate, correct, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife and made public by Chessy Prout;
   e.   Failing to investigate, prevent, and/or otherwise address references to "scoring" made in student publications;
   f.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;
   g.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of boys "seeking" girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;
   h.   Failing to promptly report Ms. Doe's sexual assaults to the authorities;
   i.   Failing to take any action to prevent retaliation against Ms. Doe after her

assaults were reported to SPS;

j.    Failing to conduct an exit interview with Ms. Doe when she left the school;

k.    Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies; and,

l.    Retaliating against Ms. Doe for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

134.    SPS, through its Board of Trustees, administrators, faculty, or staff, knew or should have known that they had created the opportunity for Ms. Doe to be sexually assaulted and sexually harassed.

135.    Defendant's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

136.    As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, Ms. Doe has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

137.    As a direct and proximate result of Defendant's negligence, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of the jurisdictional amount of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as lost wages, interest, costs, and other relief as justice requires.

## COUNT FOUR
*Premises Liability*

138.    Plaintiff adopts and incorporates by reference the previous paragraphs as if they are fully set forth herein.

139.    While on SPS' premises, Ms. Doe was a business invitee of SPS.

140.    SPS owed Ms. Doe a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

141.    SPS, through its Board of Trustees, administrators, faculty, or staff, failed to act with reasonable care to protect Ms. Doe and her fellow female students from foreseeable dangers of which SPS had ample actual notice, including, among other things:

    a.    Failing to properly protect Ms. Doe, a minor, from sexual abuse and harassment;

    b.    Improperly protecting Ms. Doe, a minor, from sexual abuse and harassment;

    c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.    Failing to investigate, correct, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife and made public by Chessy Prout;

    e.    Failing to investigate, prevent, and/or otherwise address references to "scoring" made in student publications;

    f.    Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

    g.    Ignoring and/or otherwise failing to properly address complaints about numerous instances of boys "seeking" girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

    h.    Failing to promptly report Ms. Doe's sexual assaults to the authorities;

    i.    Failing to take any action to prevent retaliation against Ms. Doe after her assaults were reported to SPS;

    j.    Failing to conduct an exit interview with Ms. Doe when she left the school;

    k.    Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies; and,

l. Retaliating against Ms. Doe for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

142. SPS knew or should have known that SPS had created the opportunity for Ms. Doe to be sexually assaulted and sexually harassed.

143. Defendant's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

144. As a direct and proximate cause of Defendant's violation of its duty to her, Ms. Doe has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

145. As a direct and proximate result of Defendant's negligence, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of the jurisdictional amount of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as lost wages, interest, costs, and other relief as justice requires.

## COUNT FIVE
### *Intentional Infliction of Emotional Distress*

146.    Plaintiff adopts and incorporates by reference the previous paragraphs as if they

are fully set forth herein.

147.    Defendant intended to cause Ms. Doe emotional distress or acted with reckless

disregard to the certainty that they would cause such distress by, among other things:

   a.   Failing to properly protect Ms. Doe, a minor, from sexual abuse and harassment;
   b.   Improperly protecting Ms. Doe, a minor, from sexual abuse and harassment;
   c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;
   d.   Failing to investigate, correct, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife and made public by Chessy Prout;
   e.   Failing to investigate, prevent, and/or otherwise address references to "scoring" made in student publications;
   f.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;
   g.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of boys "seeking" girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;
   h.   Failing to promptly report Ms. Doe's sexual assaults to the authorities;
   i.   Failing to take any action to prevent retaliation against Ms. Doe after her assaults were reported to SPS;
   j.   Failing to conduct an exit interview with Ms. Doe when she left the school;
   k.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies; and,
   l.   Retaliating against Ms. Doe for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

148.    Defendant's conduct was extreme and outrageous, and it intentionally or

recklessly caused Ms. Doe severe emotional distress.

149.    Defendant's conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

150.    Defendant's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

151.    Defendant purposefully intended to cause or recklessly disregarded the high probability of causing a disturbance of Ms. Doe's emotional tranquility that was so severe that harmful physical consequences resulted.

152.    As a direct and proximate cause of Defendant's malfeasance and nonfeasance, Ms. Doe has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

153.    As a direct and proximate result of Defendant's malfeasance and nonfeasance, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of the jurisdictional amount of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as lost wages, interest, costs, and other relief as justice requires.

## COUNT SIX
### *Negligent Infliction of Emotional Distress*

154.    Plaintiff adopts and incorporates by reference the previous paragraphs as if they are fully set forth herein.

155.    Defendant had a duty to Ms. Doe to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her.

156.    To the extent Defendant's conduct is not found to be reckless and/or intentional, the conduct is—at the very least—negligent.

157.    Defendant's negligent acts include, but are not limited to:

    a.    Failing to properly protect Ms. Doe, a minor, from sexual abuse and harassment;

    b.    Improperly protecting Ms. Doe, a minor, from sexual abuse and harassment;

    c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.    Failing to investigate, correct, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife and made public by Chessy Prout;

    e.    Failing to investigate, prevent, and/or otherwise address references to "scoring" made in student publications;

    f.    Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

    g.    Ignoring and/or otherwise failing to properly address complaints about numerous instances of boys "seeking" girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

    h.    Failing to promptly report Ms. Doe's sexual assaults to the authorities;

    i.    Failing to take any action to prevent retaliation against Ms. Doe after her assaults were reported to SPS;

    j.    Failing to conduct an exit interview with Ms. Doe when she left the school;

    k.    Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies; and,

    l.    Retaliating against Ms. Doe for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

158.    As a direct and proximate cause of Defendant's malfeasance and nonfeasance, Ms. Doe has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

159.    As a direct and proximate result of Defendant's malfeasance and nonfeasance, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of the jurisdictional amount of $75,000 in compensatory damages to be established at trial, as well as lost wages, interest, costs, and other relief as justice requires.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues in this action so triable.

Respectfully submitted,

Date:  May 11, 2018                    /s/ Charles G. Douglas, III
                                       Charles G. Douglas, III (NH Bar #669)
                                       DOUGLAS, LEONARD & GARVEY, P.C.
                                       14 South Street, Suite 5
                                       Concord, NH 03301
                                       Phone: (603) 224-1988
                                       Fax: (603) 229-1988
                                       chuck@nhlawoffice.com

                                       and

/s/ Steven J. Kelly
Steven J. Kelly (MD Bar #27386)
(*pro hac vice* forthcoming)
/s/ Deborah K. Marcuse
Deborah K. Marcuse (NY Bar #4799649)
(*pro hac vice* forthcoming)
SANFORD HEISLER SHARP, LLP
400 East Pratt Street, 8th Floor
Baltimore, MD 21202
Phone: (410) 834-7420
Fax: (410) 834-7425
skelly@sanfordheisler.com
dmarcuse@sanfordheisler.com
*Attorneys for Plaintiff*